Good morning, Your Honor. My name is Jim Lopesenz. I did recently, about three weeks ago, I was retained by Mr. Seleznev's other lawyers to represent him in oral argument here, and I represent Mr. Seleznev. Thanks, Mr. Lopesenz. It's nice to see you again. Nice to see you. I will hope to reserve five minutes. Okay. Now, I plan to talk about two of the issues, not all of them, principally to talk about the sentencing issue at first, and then also to talk about the motion to dismiss and the way in which Mr. Seleznev was apprehended and brought to the United States. As to the sentencing issue, it's my position that there was both a procedural error and the sentence is also substantively unreasonable. The two are very intertwined. It's hard to tease them apart, but the procedural error is really failure to consider and failure to explain the very lengthy sentence imposed on Mr. Seleznev. Mr. Seleznev was 32 years old when he stood before the court and he received a sentence which is almost equal to his life, 27 years. He had no prior criminal convictions. As of course, the court knows under 3553, the substantive reasonableness of the sentence is to be reviewed under the standard to see whether the length of the sentence was necessary to accomplish all the purposes listed in subsection 2 of that statute. Was it really necessary to get a 27-year sentence to protect the public from Mr. Seleznev and future crimes or any of the other purposes spelled out in 3553 like deterrence or respect for law? Well, I noticed only yesterday that Mr. Seleznev's attorneys had not cited the en banc decision in Ressam and so I wanted to at least file something saying that I am in part relying upon it and bringing it to your attention. There was a pretty important thing said, a couple of important things said in that decision, one of which is that while the standard of review is deferential, it's not anything goes. And in this case, Mr. Seleznev has received a sentence which is longer than you can get if you have no prior criminal convictions for first-degree premeditated murder in state court in Washington and that I hope seems to you, I hope that makes you raise an eyebrow. In Ressam, this court said on page 1091, although recidivism ordinarily decreases with age and the court went on to say, not for terrorists and also not for sex offenders. Mr. Seleznev is not a terrorist. In fact, he's a victim of terrorism, not a terrorist, which I will get to when I talk about his medical condition. Terrorists, as I read the Ressam decision, it recognizes that terrorists are motivated by ideological and often in this day, religious concerns. Their motives for committing crimes can go to the core of who they are, especially when it's religious. And they may even want to be a murderer. The fact that they may get caught and sent to prison or die is not the kind of thing which deters them because in Mr. Ressam's case and others, it's a deeply held religious conviction that what they're doing is morally right. That doesn't go for people, ordinarily doesn't go for people who steal money and make money by illegal means. The district court said, and I'm not going to quarrel with it at all, that Mr. Seleznev's motives were economic gain and greed and to make a living. But my point is that ordinarily, ordinarily that kind of crime is not repeated if you are hammered with a fairly lengthy sentence. It's the kind of thing that burns out over time, too. Everybody likes money. But it's not reasonable to say, Mr. Seleznev, after 27 years in prison, or he has to be there in 27 years because if he gets out any earlier than that, he'll go right back to doing this. People don't like being in prison. And it is incumbent to satisfy the statute for the government to come up with some justification for why the district court could say, well, three years or five years or seven years or not, enough to make sure that this 32-year-old man won't go out and do this kind of thing again. Counsel, could I interject a question? What was the guidelines range? Life, life. But because it's treated, sort of maxed out at a level 43, but it's life. Okay. So if the maximum was life, and the court gave 27 years, and you think it's not substantively reasonable. I do not. It's not, right? I do not. What would have been substantively reasonable? What's the most you think the district court should have sentenced him to? I'm trying to think. If I had been the district court judge, what is the most that I could say I can justify this? Fifteen years? I don't know. He's 32 years old, and I haven't yet addressed the fact that he doesn't have all of his brain because half of his skull was blown off and because he's got a serious traumatic brain injury and a couple of other things. But to go back a minute to your reference to the guidelines, it is the law of the circuit and the law of the United States, I think, that there's no presumption that the guideline range is correct. And it says at the end of the PSR, there's an acknowledgment there, the last sentence in the PSR is that the author says the guidelines here clearly overstate the seriousness of this and the type of sentence the person ought to get. In this case, one of the things that his attorneys in the district court said was, he had a terrible childhood. I don't think anybody disputes that. He was abandoned by his father who moved from Vladivostok to Moscow when he was two years old. He had no relationship with his father. He had a mother who was an alcoholic. He had a mother who was so alcoholic that he discovered her dead from alcohol poisoning in the bathtub when he was 17 years old. He had nobody to raise him and he had no particular avenue of how he was going to make a living in a career and he went into crime. And that was argued as one of the things, one of the characteristics of the defendant to the district court that you ought to take that into consideration. And the district court judge said, lots of other people grow up in poverty and they don't commit crime. And I submit, that's an abuse of discretion. I mean, that's essentially rewriting the statute. That's essentially saying, I don't care that Congress in this statute said, look at the characteristics of the defendant. Lots of people have terrible childhoods and I just don't consider that because lots of those people don't go on and commit crimes. That kind of a per se rule would lead you to say that if a child was starving and sexually and physically assaulted three nights a week for 15 years that you just wouldn't consider that because lots of people that happens too and they grow up and they don't become major criminals. That isn't logical. Small point, but I wanted to point out about the statutory purpose about respect for the law. I think it's dangerous to assume anything about the culture, about the cultural values attached to respect for law that a person who grows up in Russia is going to have. I don't think it's a big leap for me to say to you that there's not a lot of respect for law in the Russian Federation or in the Soviet Union. The head of the Russian Federation is, I would say, a thug who murders his opponents. People get ahead there by corruption, by bribing people. So to say, oh, I'm going to treat you, this is necessary, 27 years to show you how to a characteristic of the defendant, which is important, which is that he grew up in a corrupt country which doesn't respect law and which thinks it's normal to bribe people to get ahead. I want to talk about deterrence as a purpose of the statute. Most criminals really don't think about deterrence at all. They just think they'll never get caught and it doesn't dawn on them. Criminals who do this kind of thing, I think, do think about deterrence and the evidence in the record here, I mean, they do think about getting caught. And the evidence in the record here is that the moment he was arrested, he said, but there's no extradition treaty, is there, between the Maldives and the United States? So obviously, he did think about the fact that he's going to go on vacations and travel places where there's no extradition treaty. But when you're saying, what do I have to give this man as a sentence now, well, when he gets out, he now knows that the fact that there isn't an extradition treaty is no guarantee that he's not going to get apprehended and sent to the United States. He knows that now. So I think that's something to take into account, that you don't need to lock him up for 27 years. The most important procedural error about failure to explain committed by the district court is just simply not responding to the arguments about his medical condition. There were undisputed facts about how he got this brain injury. He was in Morocco, and he had the bad fortune to go to some cafe and sit there that a suicide bomber also selected to blow himself up in. Twenty people were killed, but Mr. Seleznev was not killed. He was almost killed, but he wasn't killed. And part of his skull came off. He survived. He miraculously survived. He was evacuated. He was flown to Russia. He had a year or more in Russian hospitals that he lived. All those medical records are in the record of this case, and those medical records are also in the excerpts of record. No one contests the fact that he has a chronic seizure disorder. No one contests the fact that he has a third of his top of his skull is now an artificial titanium top. No one contests the fact that he had to learn to talk and walk again because he lost the ability to do that. And no one replied when both his attorney at the sentencing hearing said, the doctors say he can expect progressive deterioration in his mental condition. It's going to get worse as he gets older. And no one contested the fact that he and Mr. Seleznev both said, the doctors don't think I'm going to live to be in my 50s. So effectively, this is a life sentence for him. And if he ever should serve this long and get out, what reason is there to think that he's going to go right back to doing this when he doesn't have as much of a brain as a normal person does because he lost part of it to this horrible accident? And the district court didn't respond to anything said about his medical condition, just never mentioned it. I think, I would argue to you, that's similar to the failure to explain. I thought he did note his near death experience. The district court judge did not talk about his medical condition. He may have talked about the fact that I know you were in an accident, but he never talked about it. No, he characterized that following the incident that he had to struggle for his life due to what happened to him. You must be right. If you're telling me that, Your Honor, there must be two or three words saying that he said that. But he didn't talk about he's going to die in jail. Doesn't that suggest that the district court judge was fully aware of it and knew about it? So what was he supposed to do? He's supposed to explain why that somehow, notwithstanding that, he's rejecting the defense argument that I need to lock you up for 27 years because otherwise either you'll go back to this or I won't protect the public or there won't be respect for law or one of these other things. And he doesn't explain it. Well, suppose he says, you know, I'm aware of, well, we can assume that he read the briefs and the PSR, right? It's like Rassam, isn't it? We can assume that Judge Kunauer read everything in Rassam, too, but Judge Kunauer did not explain why a man who repudiated his cooperation agreement, recanted his testimony, thereby sacrificing two prosecutions, why he would give him the same amount of leniency that he had given him in an earlier sentencing when the man had done all that. And this court said that failure to explain was a procedural error and that failure to explain carries over into the substantive error. If you can't give an explanation as to why you're doing this, then the court concluded this is an abuse of discretion. So if the judge had said, so what you want the record to reflect is that, yes, I'm aware of your condition, the record documents what happened, recovery was serious, near-life death experience. But nonetheless, I don't think that provides any basis for me to reduce the sentence. I don't think that would be enough, Your Honor. Respectfully. What's he supposed to do? He's supposed to say why he doesn't think that would be enough. I don't think it's enough because I think you'll go back to doing this and you'll just keep stealing from banks and people, even when you get out, if you live that long. I mean, he didn't even answer. He's not expected to live that long, Your Honor. He didn't even answer that. Nobody answered that. I don't have a lot of time left, and I do want to touch upon the motion to dismiss and the way he was brought before the court, and I want to zero in on what I think is the key to my argument. It's a finding of fact made by the district court, which has no support in the record and is actually contradicted by the record. And that finding of fact is, let me see if I can find it exactly, it's in the excerpts of record, page 46, Maldivian authorities appear to have elected to accept a red notice as an alternative to a warrant. And to put that in context, the evidence is really all undisputed. These Secret Service agents, through the State Department, contacted some Maldivian authorities. They said, we want your help. Will you give us some help? They said, we'll assist you. They said, our plan is, you know, you arrest him and then you turn him over to us. They got some word back from a police commissioner, yeah, we'll arrest him and we'll turn him over to you. The Maldivians asked for documents. It's undisputed. They gave them the documents they requested. And the Secret Service agents were arriving on July 3 and 4. They're having meetings with the Maldivians and the arrest is made on the 5th. And on the afternoon of July 4, the day before the arrest, suddenly we know from undisputed emails that involve the State Department official, suddenly the Maldivians say, we are pursuing an arrest warrant. We need an arrest warrant from a Maldivian judge. That's Exhibit 4. It says, we are waiting for that court warrant. That comes at 4 o'clock in the afternoon on July 4. And in Exhibit 5, they are told a little bit later, I think, we expect the warrant will be done by 9. It doesn't have an a.m. or a p.m. after it, but as near as I can tell, that means 9 tomorrow morning. Then at 1.20 a.m. on the morning of July 5, there's another exhibit that says, there's evidence that the State Department hears the Maldivians want a red notice issued from Interpol. And it's undisputed that that red notice was issued at 7 a.m. in the morning. So the issuance of that red notice creates a need for speed, at least in the minds of the agents, who they think they've seen this happen before in another country when they were looking for Mr. Seleznev. Once there was something put out over Interpol, the Interpol red notice was put out, it seems he got away. So it's undisputed that now the Russians know, because the red notice is issued, Mr. Seleznev is coming around 10 o'clock to take an 11 o'clock flight, and we have to act fast. No warrant ever comes. No warrant is ever issued. No Maldivian ever arrests him. The United States eventually concedes. He was arrested by a Secret Service agent, Mr. Schwander. And if you look at the red notice, which is excerpts of record, I think it's 122, it has two little provisions. One is about extradition, but there is no extradition treaty between the Maldives and the United States. And the other is labeled provisional arrest. It says, for the country at the request of which the present notice has been published, that's the United States of America, this red notice is to be treated as a formal request for provisional arrest. This red notice issued at the request of the United States is the United States' request that the Maldivians go and arrest him, which, it's undisputed, never happened. So the district court's finding that the red notice was apparently accepted as an alternative to Maldivian arrest makes no sense, because the red notice says, we want you to go arrest him, which everybody agrees never happened. So what does that lead you to conclude? I mean, I don't quite, I mean, I understand what you just went through, but why did that rise to a due process violation? Well, I think it, I think it's Struttman that says, does this violate a right, a recognized right of Mr. Seleznev or Juice Coggins? Does it taint the judicial process? Is there a need to deter this kind of behavior? And if so, I think it could be either outrageous governmental misconduct or it could give rise to the need for the exercise of your supervisory powers to keep the hands of the court clean and to deter this kind of conduct. And it does violate his recognized rights. I think his lawyers pointed out in the reply brief, it violates the international covenant of civil and political rights, Article 13, clearly. There's no argument as to why it doesn't. It violates Juice Coggins. It taints the judicial process. It's a warrant issued out of this court. And that's what he's arrested on. So I would ask you to just think of it as the shoe on the other foot. Think of it if the Russians did this in the Maldives by spiriting away an American citizen that they wanted to try for something in Russia. And the finding was, well, a red notice arrived, and so suddenly we don't need an arrest warrant anymore and we can just take him. This country would call that kidnapping. And I think you should, too. I don't have much time left, but what I have, I'll keep. Thanks, Mr. Lobson. Now, your time's almost up, but we'll add an extra minute to that for rebuttal for your planning purposes. And we'll let the government have an extra minute. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Michael Morgan for the United States. I appreciate the dilemma counsel finds himself in, parachuting into this case late. But oral argument is not the time to be advancing claims that are nowhere in the briefs. Nowhere in the briefs is there any claim that the motion to dismiss should be reversed due to an erroneous factual finding. Nowhere. Similarly, nowhere in the briefs is there a claim that the district court committed procedural error in failing to adequately explain its sentence. Nowhere. Those claims are waived. Full stop. On the merits, what counsel would like this Court to call a kidnapping was, in fact, a paradigm example of cooperation between two countries to bring a fugitive to justice. The Maldivian officials agreed to assist. The Maldivian officials, on their own, with the approval of their attorney general and president, expelled him into the United States' custody, and he was immediately taken to the United States for a prompt arraignment. Under no set of facts could that rise to a level of a due process violation, not under this Court's precedence and certainly not under the Supreme Court's precedence. So, and with respect to whether or not there was a violation of Maldivian law, that's simply irrelevant. Whether or not a domestic arrest warrant was required under domestic law, which, considering the attorney general of the Maldives signed off on this operation, I would doubt, but even assuming that to be the case, that's not misconduct that's charitable to the United States. The United States specifically requested that Mr. Seleznev be expelled in accordance with Maldivian law. Whatever the Maldivians did, whatever remedy Mr. Seleznev may have against the Maldivians, that is not a basis for this Court to, or for the District Court to divest itself over jurisdiction when the United States officials violated none of his rights. Mr. Morgan, I have a question for you. It was represented by the appellant that the guidelines range went up to life. Could have been life. What I wanted to know was what went into the guidelines determination? Did it have to do with the number of counts? The amount of money involved? We're talking about the actual cap of the guidelines. Because he was capped out at 43, even with a level 1, the guidelines did provide for a life sentence, but none of the counts of conviction, in fact, would authorize a life sentence. So under the guidelines, the guideline sentence is the maximum permissible statutory sentence, which in this case, if I've done my math correctly, is 515 years. If you take every count and run it consecutive, that's the maximum sentence that would be allowed. This was a 27-year sentence. I'm not going to stand before this Court and say that's not a severe sentence, but it's also a sentence that shows that the District Court was not really influenced by the guideline calculation. I mean, it knew what the range was, but it wasn't. It was not trying to max him out in that respect. Would it be kind of hard to sentence him to 500 years unless he was a sequoia tree or something? He would need excellent health care to survive. That's true. But it does go to show, I mean, even a 27-year sentence is not – I understand the position that given certain health conditions Mr. Sleznev has, that this is functionally a life sentence. I'm not certain that's true. There's been no showing that the Bureau of Prisons can't adequately care for Mr. Sleznev in his custody. With respect to one point that counsel made, that somehow his medical conditions support a lesser sentence because he's not going to commit crime, what did he do after he suffered those injuries in his terrorist attack? After he recovered, he started up again. So obviously whatever issues arose from those injuries, they certainly didn't prevent him from acting in the same criminal manner he had before. So I don't really understand how the fact that he has these injuries is somehow a mitigating factor. And I would also point out that the record makes quite clear that the district court knew very well Mr. Sleznev's medical conditions. He actually discussed it, as just Pius pointed out, and it's on ER 58. He says, quote, Your third chance to avoid all this occurred when you had a near-death experience that should have been your wake-up call to abandon the fraud that you had already committed in multiple ways. Three months of recovery, struggling for your life. That should have been an invitation to give your wrongs, to right your wrongs and recognize that you had been given a second chance in life. Instead, your recovery was focused on recalibrating and building a cyber-fraud dynasty. The court knew all about this. It just didn't feel that Mr. Sleznev's medical conditions warranted a further downward variance. Neither this Court's precedents nor the Supreme Court precedents require a court to address in detail every mitigation argument advanced by a defendant. As long as the record shows that the court knew about the arguments and considered them, that is sufficient. That is procedurally sufficient. And the record here is, under this Court's precedents, is more than sufficient for you to find that he gave, he considered them and committed no procedural error in considering them. I can't remember now. Too many cases. But what was the government's? 30 years. 30 years. It was the probation office that recommended 27. Correct. And the judge? Went with probation. Went with probation. Yes. The defense didn't offer a recommendation. They just asked for a substantial downward variance, which they got. And again, when you're looking. What was in the? Were you the trial lawyer? I was not. What was in the calculation to recommend a 30-year sentence? You know? Well. You know, I'm going to tell you, 27 years does, as you started out saying, seems like a severe sentence. Well, I think there's a lot of benchmarks you can look at in our sentencing brief. We pointed out some, you know, fraud defendants in our district with much lesser losses who got 30-year sentences. We pointed out, perhaps like the, one of the best benchmarks is Mr. Slezna was indicted in the District of Nevada on charges that arose out of the very scheme that's at issue here. And a low-level player in that case went to trial and got 20 years. A low-level player. All he did was buy some cards on Mr. Slezna's website and commit street-level fraud. 20 years. Mr. Slezna's the kingpin. He's the kingpin. How is a 15-year sentence for the kingpin not disproportionate? And this Court affirmed that 20-year sentence on, subject to a substantive reasonableness challenge. So if 20 years is substantively reasonable for a low-level player, an extra seven for the top dog can't be substantively unreasonable. And I think that's sort of where the government's calculus was, is looking at those players. Thank you. That helps. What would you say are the most important Supreme Court precedents and Ninth Circuit precedents that give us guidance about how to decide what's substantively reasonable? Well, it's simply, I mean, that's unfortunate because the precedents are simply that the district court has discretion. And it's an abuse of discretion standard. We don't have any cases. We have not intervened. No. Generally in sentencing decisions. No. Because really, sentencing is for the district court. It's got to be, I mean, I understand the court ultimately in Rassam reversed for substantive reasonableness because the sentence was too low. You don't see the court intervening, and that was a very unique case. But in the mine run case, this court does not interfere unless the district court is completely off the reservation. And you just can't say that on this record. And I think it's unfair to Judge Jones to suggest that he didn't explain his sentence. His explanation went on for over eight pages. I mean, he went in detail about all the aggravating factors he found and how Mr. Slezev had never accepted responsibility, how he had tried to manipulate the courts after his arrest, how he had just on and on and on about all the factors he found. And when you're thinking about this sentence, I think it's important to remember Mr. Slezev was operating on the thinking that he was immune from sanction. That was his M.O. He stayed in Russia knowing full well that he could operate and face no consequences. He thought that when he went to the Maldives. He just miscalculated. But that's a defendant, again, who I have, if you're thinking about if he's likely to be a recidivist, why is he not when he's finished with his sentence going to be removed to Russia? There's no reason he wouldn't start up again. He would again be immune. So in terms of general deterrence, I think the court was quite correct to say that these cyber hackers who are overseas and immune from process need to be tested. They need to know that they are not operating with impunity. And if they step out, they face substantial risk. I mean, look at the losses in this case. Almost 170. This just ensures that hackers in Russia will never leave. Won't visit Maldives again. It may hurt the Maldivian tourist industry. I understand. But it's true. It's that they really do think that there's nothing to deter them. Correct. And I think the district court needed to send that message as a matter of general deterrence. That these crimes, if you are caught, you will pay a price. And again, when you look at the amount of losses, almost 170 million. That is a lot of money. Mr. Sleznev caused a lot of damage to small businesses. You know, those are the real victims here. The financial institutions, no one is going to shed a tear for the financial institutions. But the mom-and-pop businesses who are like having to pay these remediation costs. Record shows one of them actually went bankrupt. I mean, these are, this is serious harm. And it calls out for serious punishment. And certainly under an abuse of discretion standard, you can't say that Judge Jones abused his discretion. Especially compared to the record. Does the record indicate the number of victims in the case, both mom-and-pop stores and big banks? The record, there is a complete list of restitution that's owed. The trial record, we highlighted the local businesses that were harmed. And there was in fact one of the trial, one of the businesses that did testify that he was bankrupted by the remediation cost that resulted from this. So the record does support that, you know, that actual finding.       Does the record indicate the number of victims in the case? There is a list of restitution that is owed. There is a separate list of coercion authorizations,   m More than the 410,000,000 that they gave me. Again, it is not this sentence. Those stiff, the sentences to other fraudsters, again, that are identified in the government sentencing brief, 20 years, 25 years for losses less than this, so for $170 million, 27 years is steady money. I'm not sure what the government's views on it. And that's the, you know, the proffer issue. Yes. With respect to whether or not he waived. Yes. Waived the 410, I guess, privilege. Yes. The issue as I understand it, well, the district court found that he waived the 410 with respect to his own statements. The district court found that he had not been adequately advised with respect to how his proffer would affect his attorney's ability to present a defense. So the court ruled that the 410 waiver was still applicable, or it was not applicable to defense counsel's argument. So no matter what defense counsel did, Mr. Slebin's proffer statements were not coming in. The court did go further and said, counsel, you have an ethical obligation not to present evidence or argument that you know or have reason to believe is false. If you think you have a good faith basis to believe that some proffer statement might not be true and so, therefore, you want to present this, that's fine. But that was separate and apart from the waiver. So this is a general ethical obligation. It's a general ethical obligation. Right. And the court vindicated Mr. Sleznev's 410 rights by not enforcing that one provision of the waiver that he didn't agree to. So he's been given all the relief he was due. So I don't – I think – does that address what the Court's concern was about that point? Yes. Okay. Thank you. I just want to make sure I understood it. Yeah. It's limited. It's just limited to what defense counsel could. But did they ever suggest that there was something they wanted to present that they couldn't? No. No. And in fact, at the evidentiary hearing, then defense counsel sort of recognized that the reason they wanted the proffer, and in fact, it was Mr. Sleznev and his father who were pushing for the proffer, because they all recognized the evidence of guilt, especially once his computer was searched. It was just – there was no defense. The normal defense in a hacker case is I'm not the person behind the keyboard. And that is the defense they raised. You know, they argued that there was evidence from which you could suggest that someone else was doing it, that the government hadn't proven which they were – and that's the thing. They were allowed to argue the government hadn't met its burden, and they did. They argued that the government hadn't proven that Mr. Sleznev was behind the keyboard. But there was really no way, once you had his computer, once you had all the passwords to all the carding sites, that they would be able to get up and say with a straight face, my client didn't do it, which is really the only defense that was barred by – that would have been barred by the proffer waiver or the Court's ultimate ruling enforcing the counsel's ethical obligations. So, no, the defense has never identified any defense that they somehow were unable to present because of this ruling. Unless the Court has questions with respect to any of the other issues, the government would ask that the judgment and sentence be affirmed. Thank you. Thank you. I wanted to respond to the contention that things weren't raised. With respect to the finding of fact that I say has no support, I agree. That was not raised by anybody until me today. But all that stuff is in the record, including the red notes, and it's there, and it makes it plain that it's clear error. With respect to the argument that they did not raise failure to explain argument, I don't agree with that, and I refer you to page 61 of the opening brief where Mr. Sleznev's claim to mention, let alone consider, appellant's precarious medical condition. Okay. They didn't use the word explain, but they said he didn't even get to considering it. He didn't even mention it. And he mentioned it. He didn't talk. So, I think that was raised. With respect to, you asked a question, Judge Paez, about did the defense offer a specific sentencing recommendation. They did not. However, at the very end of their presentation, defense counsel said, you know, Mr. Sleznev has already been locked up for three years now prior to sentencing, and he's already suffered a lot. He won't do it again. And Judge Jones responded directly to that, and he seemed to interpret it as suggesting I give him just three years. That would plainly not be enough, and it would reward people that they only have to go do three years of time in order to make these massive amounts of money. So, he didn't exactly suggest three years, but he kind of quietly hinted at it, which I would say would not be a reasonable sentence, really, for this. When you ask about the size of the loss and the guidelines, I do want to point out that the special application note for fraud cases says that anytime there's an unauthorized use of a credit card, it automatically, the court shall treat that as a $500 minimum loss. And that means, in this case, with 2. something million stolen credit cards, that when they multiplied that by $500, they came up with a loss of $1.2 billion, which automatically added 30 levels. Just 30 levels. Bingo. Which is, I think, one of the reasons probation said that these guidelines really don't make a lot of sense here. I thought the opening brief did a good job, and I repeat, of saying there's an awful lot of overlap here between sophistication, use of a computer, more than 10 victims, large loss. Yes. Once you, when you're involved with a computer, hacking, and stealing these kind of stolen numbers off credit cards, all of those things are going to always be present, and yet they contributed another 2 levels, and another 2 levels, and another 2 levels, and another 2 levels. Mr. Lopez. I'm done. I'm afraid you're over your time.  It's an excellent argument from you. Thank you, Your Honor. Thank you, Mr. Morgan, but if I give you more time, we'd have to let Mr. Morgan have some more time. Thank you. Thank you both for excellent arguments. We're always happy when we sit in Seattle, because it has such great advocates here. So thank you both, and the Selesneff case shall be submitted. And as I mentioned at the outset, Judge Gregerson will watch and listen to the arguments and participate in the panel decision, which you'll get from us in due course. Thank you again. We are adjourned.
judges: Gould, Paez, Pregerson